**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia K. Venditti (State Bar No. 332688)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
       jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: jmarchese@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARMAINE TATE, individually and on behalf of all others similarly situated, | Case No. 2:24-cv-01327-DJC-CSK |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| VITAS HEALTHCARE CORPORATION, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Charmaine Tate ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant VITAS Healthcare Corporation ("Defendant" or "VITAS"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. VITAS employs a conversation intelligence software-as-a-service ("SaaS") provided by Invoca, Inc. ("Invoca"). This conversation intelligence SaaS derives data-driven insights from telephone conversations between the VITAS call centers and VITAS consumers. Specifically, VITAS callers' speech is recorded and then transcribed using natural language processing (NLP), so that artificial intelligence (AI) can 'read' it, identify patterns, and classify the data. The result is that every VITAS telephone conversation is captured by the SaaS, and the data therefrom is presented in dashboards, searchable transcripts, and reports.

2. Specifically, the Invoca conversation intelligence SaaS includes several services ("Services"): *inter alia*, Signal AI Studio; Automated Quality Assurance; Signal AI Discovery; Call Recordings and Transcriptions; and Conversational IVR (Interactive Voice Response). VITAS employs the Invoca Services.

3. Through the Services, Invoca—as aided, agreed with, employed, and permitted by VITAS—monitors, reads, records, learns the contents of, or otherwise intercepts the conversations between VITAS's contact centers and VITAS consumers (current and prospective customers). These consumers include individuals who call VITAS (i.e., its customer service line) from California to, among other things, retrieve and exchange health-related information, request hospice and/or palliative care location information, and receive additional forms of VITAS support.

4. VITAS's employment of the Services involves Invoca—a separate and distinct third-party entity from the parties to these conversations—using the Services to eavesdrop upon and record VITAS conversations to which it is not a party. That is to say, Invoca collects the contents of telephone conversations between VITAS and VITAS consumers.

5.     Invoca needs access to this data to provide the Services' features (including, *inter alia*, call recording, call transcription, and analysis thereof) described *infra*. Thus, Invoca records, accesses, reads, and learns the contents of conversations between Californians and VITAS.

6.     Crucially, neither VITAS nor Invoca procured the consent of any person who interacted with VITAS's contact centers, prior to Invoca recording, accessing, reading, and learning the contents of conversations between Californians and VITAS's contact centers. This is despite Invoca having the capability to use the contents of conversations it collects through the Services for purposes other than simply providing a recording to VITAS.

7.     Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages from Defendant for failing to comply with the California Invasion of Privacy Act ("CIPA") §§ 631 and 632.

## PARTIES

8.     Plaintiff Charmaine Tate resides in Sacramento, California and has an intent to remain there, and is therefore a citizen of California. Ms. Tate was in California when she called VITAS's customer service line, in or around December 2023.

9.     Defendant VITAS Healthcare Corporation is a Delaware corporation with its principal place of business at 201 South Biscayne Boulevard, Suite 400, Miami, Florida, 33131. Defendant does business across the nation and operates VITAS hospice and palliative care locations throughout California.[1] Defendant also directs the VITAS call center operations,[2] including VITAS's implementation of the Invoca Services.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate

---

[1] https://www.vitas.com/locations-search.

[2] *See, e.g.*, https://www.vitas.com/careers/vitas-hospice-career-insights/2018/july/world-class-customer-service-makes-a-real-difference ("Meet Ian Abdon, VP of VITAS Healthcare's Care Connection Center. … In his role as vice president, Abdon: Supervises 450 employees at call centers in San Diego, Chicago and Miami[;] Manages a team that handles 100,000 new patient referrals a year and supports more than 17,000 hospice patients and their families/caregivers daily[;] Oversees the VITAS Telecare team, staffed by on-call clinicians who are available 24/7/365 to answer questions from patients and families.").

amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

11. The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. *First*, as noted above, Defendant operates VITAS hospice and palliative care locations throughout California. Thus, Defendant has availed itself of the privilege of doing business in California. *Second*, Defendant's customer service line (and Invoca's recording thereof) are directly linked to VITAS's physical operations in California, in that consumers call the customer service center regarding the California VITAS locations. Thus, the conduct at issue here is directly related to Defendant's business in California. *See Kauffman v. Papa John's Int'l, Inc.*, 2024 WL 171363, at *3-4 (S.D. Cal. Jan. 12, 2024). *Finally*, Plaintiff and Class Members were harmed in California because that is where Invoca—as enabled by Defendant—recorded Plaintiff and Class Members.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District. Specifically, Plaintiff was unlawfully recorded by Invoca—as enabled by Defendant—in this District.

## FACTUAL ALLEGATIONS

### I. The California Invasion Of Privacy Act

13. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

14. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

15. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

16. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

17. CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

18. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

19. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so, here, against VITAS.

**II.     Defendant Violates The California Invasion Of Privacy Act**

   **A.     Overview Of The Invoca Services**

20.     Invoca is a "leader in Conversation Intelligence AI."[3] "Conversation intelligence solutions … derive data-driven insights from conversations between [a] call center and customers."[4] Specifically, "Conversation intelligence extracts usable data from human speech and conversation using natural language processing (NLP) to allow computers to 'understand' speech and artificial intelligence (AI) to extract and organize data from it. In order for the algorithm to analyze speech, it is recorded then transcribed so the AI can 'read' it, identify patterns, and classify the data. The result is that every conversation is captured and the data that matters most to [a] business is visualized in dashboards, searchable transcripts, [and] reports."[5] This allows contact centers to "[b]oost conversion rates, customer satisfaction, and operational efficiency."[6]

21.     Invoca's conversation intelligence software-as-a-service ("SaaS") includes several services ("Services"): *inter alia*, Signal AI Studio; Automated Quality Assurance; Signal AI Discovery; Call Recordings and Transcriptions; and Conversational IVR (Interactive Voice Response).

22.      Signal AI Studio is "[p]owered by patented machine learning" and allows Invoca clients to "create AI models trained on [their] business's calls that capture the intent, product/service interest, and conversion outcome of every conversation."[7] Signal AI Studio "automatically analyzes every call to [a] business, mapping conversations into themes and topics … [One] simply tell[s] it the insight [they] want to measure, and Signal AI Studio shows [] transcribed examples from [] calls that either fit or don't fit that insight."[8]

---

[3] https://www.invoca.com/company/about.
[4] https://www.invoca.com/product/conversation-intelligence.
[5] https://www.invoca.com/product/conversation-intelligence.
[6] https://www.invoca.com/solutions/contact-centers.
[7] https://www.invoca.com/product/artificial-intelligence.
[8] https://www.invoca.com/product/signal-ai-studio.

23. Invoca labels these insights as "Signals" and states that "In-call Signals [c]an include information about what took place in [a] phone call itself, including the duration of the call, words or phrases spoken during the conversation."[9]  Thus, Signal AI Studio can measure, *inter alia*:

- Caller Intent: Detect if the caller is a sales lead, current customer, new or existing patient, or job seeker;

- Caller Interest: Determine the specific product or service the caller is interested in, if they are looking for help with an online order, or need support with a product issue;

- Conversation Outcome: Detect if the caller made a purchase, booked an appointment, received a quote, or canceled a service;

- Call Events: Discover important events like if the caller asked to be called back or to speak to a supervisor; and

- Voice of the Customer (VoC) Insights: Detect if the caller asked about pricing or a specific product feature, discussed a competitor, or lodged a complaint.[10]

24. Automated Quality Assurance is a means of conducting contact center "[a]gent call scoring and coaching — supercharged with AI. Signal AI analyzes 100% of calls to identify the specific agent and score their performance for [] exact KPIs [(Key Performance Indicators)]."[11] Specifically, it can "[u]nderstand what tactics help and hurt call outcomes[, t]rack caller and agent sentiment throughout every call[, and i]mprove conversion rates by coaching agents in the exact areas they need to improve."[12]  This allows Invoca clients to "[e]valuate 100% of inbound calls[, m]ov[ing] from manually scoring a fraction of customer interactions to automatically scoring all of them[ and] … the entire call."[13]

25. Signal AI Discovery "is [] for marketers who want the customized insights of Signal AI, but don't necessarily know where to start or what to look for."[14]  It allows Invoca clients to "[l]earn new and unexpected insights from thousands of calls at once" through "unsupervised

---

[9] https://community.invoca.com/t5/invoca-overview/basic-knowledge-signals/ta-p/572.

[10] https://www.invoca.com/blog/signal-ai-studio.

[11] https://www.invoca.com/product/artificial-intelligence.

[12] *Id.*

[13] https://www.invoca.com/product/automated-quality-assurance.

[14] https://community.invoca.com/t5/conversation-analytics/signal-ai-automatically-analyze-and-detect-signal-topics-using/ta-p/663.

machine learning [that] analyzes every conversation to surface … trends, topics, and issues occurring on calls."[15] Invoca explains that Signal AI Discovery can "[d]rill down into topics and listen to sample call recordings, see most common spoken words, and view a wealth of marketing data."[16]

26. Call Recordings and Transcriptions provides "a searchable database of every call recording and transcript for deep insights into [] consumers, call handling, and more."[17] Per its website, "Invoca begins recording as soon as [a] call connects — and stays on the call no matter where it's transferred to — to capture the complete caller experience, every time."[18]

27. In addition, Invoca provides a "searchable database of every call transcribed with best-in-class accuracy by generative AI[ and allows for the r]eview [of] transcripts for unique insights into [] consumers, products, competitors, call experiences, and more."[19] Technically, Invoca explains that its "transcription engine powered by generative AI LLMs (large language models) turns call recordings into text with unmatched precision," "neural network models track the sentiment of callers and agents throughout every call," and "AI-powered named entity recognition (NER) automatically identifies and extracts words and terms spoken on a call, storing it in Invoca as structured, actionable data."[20]

28. Conversational IVR (interactive voice response) "automates interactions between a computerized system and a business's callers. It gathers information from the callers and then directs them to the correct internal menu option or live support team member depending on what the customers need."[21] "Invoca's IVR is powered by natural language processing (NLP) and can recognise both keypress and voice responses. Once the system has figured out why the customer has called, they can either continue to be assisted with the IVR system or be directed to a live customer

---

[15] https://www.invoca.com/product/artificial-intelligence.
[16] https://www.invoca.com/product/signal-discovery.
[17] https://www.invoca.com/product/call-recordings-and-transcriptions.
[18] https://www.invoca.com/product/call-recordings-and-transcriptions.
[19] https://www.invoca.com/product/artificial-intelligence.
[20] https://www.invoca.com/blog/signal-ai-launch.
[21] https://www.invoca.com/blog/7-ivr-use-cases-marketing-sales-support-teams.

service representative."[22] The system "route[s] leads to the best agents and locations to assist them," "[r]educe[s] agent and location call handling times," and can be used to "answer questions, survey customers, and collect data from callers, such as their preferred phone number, date of birth, or day and time for an appointment."[23] Callers' "IVR responses and interaction data [is viewable] in Invoca reports."[24]

29. When Invoca uses the Services on a phone conversation, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, Invoca—a separate and distinct third-party entity from the parties to the conversation—uses the Services to eavesdrop upon, record, extract data from, and analyze a conversation to which they are not a party. This is because Invoca itself is collecting the content of any conversation. That data is then analyzed by Invoca in the manner alleged above before being provided to any entity that was a party to the conversation (like Defendant).

30. Invoca has the capability to use the contents of conversations it collects through Services for its own purposes and purposes beyond simply furnishing recordings to Defendant. As an initial matter, Invoca can perform comprehensive analysis on the calls it eavesdrops upon, including identifying the category of the speaker and ascertaining the intent of the call.

31. Further, in its "Security, Compliance, and Data Privacy" notice, Invoca explains that "Invoca stores calls and call transcripts for internal queries … for approximately 26 months … Invoca makes call recordings and call transcripts available to customers in the platform for 25 months."[25]

32. Invoca states in its Privacy Policy that it uses "Personal Data"—which includes "[i]nformation about your calls to use, including phone numbers and recordings"—to, among other things: (i) "improve, operate, maintain, and, in some cases, market the Invoca Platform and our Services"; (ii) to "conduct internal research in order to enhance the Invoca Platform and Services";

---

[22] Id.

[23] https://www.invoca.com/product/conversational-ivr.

[24] Id.

[25] https://www.invoca.com/data-privacy-security-compliance.

and (iii) to "keep you up to date on the latest Invoca Platform and Services announcements, special offers, and other information."[26]

33. Similarly, the "Invoca Terms of Service" provide:

> Client Data … Client grants to Invoca, its Affiliates and applicable contractors a worldwide, non-exclusive, transferable, royalty free license to use … Client Data, as reasonably necessary for Invoca to provide and *enhance* [*i.e.*, improve] its provision of Services.[27]

34. These same Terms of Service also allow Invoca to use the recorded information "to optimize and improve Services or otherwise operate Invoca's business."[28]

35. Thus, Invoca has the capability to use the wiretapped data it collects through the Services to, *inter alia*, provide, run, personalize, improve, operate, maintain, and market its products and services, and to conduct performance reporting.

**B.  Defendant Intentionally Aids, Agrees With, And Employs Invoca's Wiretapping**

36. VITAS, "the nation's largest hospice and palliative care provider,"[29] is an "Invoca customer"[30] that receives "over 90,000 annual calls and growing"[31] in its "three call centers throughout the nation."[32]

37. An interview[33] between the CEO of Invoca, Gregg Johnson, and the Chief Marketing Officer for VITAS Healthcare, Drew Landmeier, further reveals that VITAS is "using the Invoca platform, using artificial intelligence, and identifying core Signals … to better identify what [] matters to [its] audiences."[34]  VITAS uses Invoca "to understand, 'What were [callers'] questions?'

---

[26] https://www.invoca.com/privacy-policy; *see also id.* (defining "Personal Data" as including "[i]nformation about your calls to use, including phone numbers and recordings."

[27] https://www.invoca.com/dt-terms-of-service (emphasis added).

[28] *Id.*

[29] https://www.youtube.com/watch?v=7ewD2_cZnFM at 00:41.

[30] *Id.* at 00:20.

[31] https://www.invoca.com/customers/vitas-healthcare.

[32] https://www.youtube.com/watch?v=7ewD2_cZnFM at 02:51.

[33] *Id.* at 00:05.

[34] *Id.* at 02:20.

'What were the[ir] concerns[?]' [VITAS takes] learnings from those Signals"[35] and "adjust[s] the content that [it's] delivering, … even [] adjusting call scripts for [its] call centers."[36]

38. Specifically, "VITAS [] uses Invoca to record [] whole call[s],"[37] as well as for "call routing and IVR."[38] And "[w]ith Invoca Signal AI, VITAS has a clear picture of call activity, including what [] families and referral sources commonly say and how they say it, without having to manually listen to calls. Before implementing Invoca, VITAS met with the call center to determine what words and phrases are commonly said on calls … They set up Signals in Invoca to track those phrases[.] … For example, the word 'appointment.'"[39] Understanding "the voice of the customer, whether a healthcare professional, family caregiver, or even job candidate, and knowing the words they use … is key for [] VITAS."[40]

39. Thus, VITAS employs Invoca Services. Through these Services, Invoca—as aided, agreed with, employed by, permitted by, or otherwise enabled by VITAS—reads, learns, monitors, and otherwise intercepts the content of communications between VITAS and its customers.

40. During consumers' calls, VITAS fails to inform consumers, prior to any recording: (i) that a third party, Invoca, is listening in on consumers' communications with VITAS, (ii) that a third party, Invoca, is tapping or otherwise making an unauthorized connection with the consumer's telephone conversation using the Services, and (iii) that the content of consumers' communications with VITAS are being recorded, collected, intercepted, and analyzed by a third party, Invoca, using the Services. VITAS therefore failed to procure consumers' consent for the conduct at issue. And during these calls, consumers reasonably expected their conversations with VITAS to be only between themselves and VITAS.

41. Further, VITAS knows (and knew when procuring the Services) that Invoca is a separate and distinct third-party entity from the VITAS call centers, the VITAS consumers, and the

---

[35] *Id.* at 05:18.
[36] *Id.* at 02:41.
[37] https://www.invoca.com/customers/vitas-healthcare.
[38] *Id.*
[39] *Id.*
[40] *Id.*

VITAS conversations at issue. VITAS knows that Invoca uses the Services to eavesdrop upon and record VITAS conversations to which it is not a party, and that Invoca thereby collects the contents of telephone conversations between VITAS and VITAS consumers. Indeed, VITAS hired and paid Invoca money for Invoca's services, and therefore had every expectation Invoca would do exactly this. VITAS also knows that Invoca has the capability to use the wiretapped data it collects through the Services to, *inter alia*, provide, run, personalize, improve, operate, maintain, and market its products and services, and to conduct performance reporting. Accordingly, VITAS's aiding, agreeing with, and employment of Invoca's wiretapping was done knowingly, willfully, and intentionally.

### III. Plaintiff's Experience

42. Plaintiff has called VITAS's telephone line, including in or around November 2023, when she spoke with VITAS regarding hospice care for her grandmother.

43. During these calls, Plaintiff reasonably expected her conversations with VITAS to be only between herself and VITAS.

44. When speaking with the VITAS contact center agent, Plaintiff reasonably expected the conversations would be only between herself and the VITAS contact center agent. Plaintiff was not aware, nor did she have any reason to suspect, that call recording, transcription, and analysis were being provided by a third party, Invoca, rather than VITAS. She did not expect or have any reason to expect that Invoca, a third party, was listening in on her conversations.

45. Nonetheless, Invoca, through the Services, eavesdropped on Plaintiff's entire conversation with the VITAS contact center agent. Invoca, through the Services, monitored the conversation between Plaintiff and VITAS. Invoca recorded and transcribed Plaintiff's conversation in real time, and performed AI analysis thereon (i.e., captured Ms. Tate's intent and/or reason for calling, service interests, and conversion outcome; mapped her conversation into themes and topics; tracked the words and phrases she said during the conversation; and measured call events).

46. Through this process, Invoca read and learned, in real time, the contents of Plaintiff's conversation with VITAS.

47. VITAS failed to inform Plaintiff, prior to recording: (i) that a third party, Invoca, was listening in on Plaintiff's communications with VITAS, (ii) that a third party, Invoca, was tapping or otherwise making an unauthorized connection with Plaintiff's telephone conversation using the Services, and (iii) that the content of Plaintiff's confidential communications with VITAS were being recorded, collected, intercepted, and analyzed by a third party, Invoca, using the Services. VITAS therefore failed to procure Plaintiff's consent for the conduct at issue.

48. Plaintiff has, accordingly, had her privacy invaded and been exposed to the risks and harmful conditions created by VITAS's violations of CIPA alleged herein.

## CLASS ALLEGATIONS

49. Plaintiff seeks certification of the following class: all California residents who called VITAS's customer service line while in California and whose conversations with VITAS were intercepted and recorded by Invoca (the "Class").

50. Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

51. The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

52. **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the

merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

53. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632; whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class; and whether Plaintiff and members of the Class are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

54. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class members, called VITAS's telephone line and had the content of her communications with VITAS read, learned, analyzed, and/or examined by Invoca.

55. **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

56. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631(a)

57. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

58. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

59. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

60. To establish liability under CIPA § 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

      Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

61. The Services are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

62. Invoca is a separate legal entity from VITAS that offers "'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, Invoca was a third party to any communication between Plaintiff and members of the Class, on the one hand, and VITAS, on the other. *Id.* at 521; *see also Flowers v. Twilio, Inc.*, 2016 WL 11684603, at *1 (Cal. Super. Ct. Aug. 2, 2016) ("[T]he complaint makes clear that it is Twilio, not its clients, that recorded the communications … The allegations are not, as Twilio asserts, that Twilio simply provided a software product that third parties misused.").

63. Invoca is a third party wiretapper because it has the capability to use the contents of conversations it collects through the Services for its own purposes, other than simply furnishing the recording to Defendant. *Javier v. Assurance IQ, LLC*, 2649 F. Supp. 3d 891, 900 (N.D. Cal. 2023); *see also Yockey v. Salesforce, Inc.*, --- F. Supp. 3d ---, 2023 WL 5519323, at *5 (N.D. Cal. Aug. 25, 2023).

64. At all relevant times, through the Services, Invoca violated the first prong of CIPA § 631(a) by intentionally tapping, electrically or otherwise, the lines of telephone communication between Plaintiff and Class Members, on the one hand, and VITAS, on the other hand.

65. At all relevant times, through the Services, Invoca violated the second prong of CIPA § 631(a) by willfully and without the consent of all parties to the communication, or in any unauthorized manner, reading or attempting to read or learn the contents of electronic communications between Plaintiff and Class Members, on the one hand, and VITAS, on the other hand, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

66. At all relevant times, by contracting for the provision of the Services and allowing Invoca to access and intercept Plaintiff's and Class Members' communications, VITAS violated the

fourth prong of CIPA § 631(a) by aiding, agreeing with, employing, permitting, or otherwise enabling Invoca's unlawful wiretapping.

67. VITAS failed to inform Plaintiff and Class Members: (i) that a third party, Invoca, was listening in on communications between Plaintiff and Class Members, on the one hand, and VITAS on the other hand; (ii) that a third party, Invoca, was tapping or otherwise making an unauthorized connection with Plaintiff's and Class Members' conversations with VITAS using the Services; and (iii) that the content of Plaintiff's and Class Members' communications with VITAS were being recorded, collected, intercepted, and analyzed by a third party, Invoca, using the Services.

68. Accordingly, neither Plaintiff nor any Class Member provided their prior consent to Invoca's interception of their communications with VITAS, nor did Plaintiff and Class Members consent to VITAS's employment of the same.

69. VITAS knows (and knew when procuring the Services) that Invoca is a separate and distinct third-party entity from the VITAS call centers, the VITAS consumers, and the VITAS conversations at issue. VITAS knows that Invoca uses the Services to eavesdrop upon and record VITAS conversations to which it is not a party, and that Invoca thereby collects the contents of telephone conversations between VITAS and VITAS consumers. VITAS knows (and knew when procuring the Services) what, *inter alia*, the Invoca "Privacy Policy"; "Invoca Terms of Service"; Invoca "Master Services and Subscription Agreement and Terms of Service"; and the "Terms of Service" state regarding Invoca's use of the contents of the conversations here at issue for Invoca's own, unlawful purposes. Specifically, VITAS knows that Invoca has the capability to use the wiretapped data it collects through the Services to, *inter alia*, provide, run, personalize, improve, operate, maintain, and market its products and services; and conduct accounting, auditing, and performance reporting.

70. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by the violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of VITAS's violations of CIPA § 631(a).

# COUNT II
## Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632(a)

71. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

72. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

73. CIPA § 632(a) prohibits an entity from "intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio." Cal. Penal Code § 632(a).

74. The Services are an "electronic amplifying or recording device."

75. At all relevant times, VITAS intentionally used the Services to record the confidential communications of Plaintiff and Class Members.

76. At all relevant times, the communications between Plaintiff and Class Members, on the one hand, and VITAS, on the other, were confidential. The communications included hospice- and palliative care-related information (i.e., Plaintiff and Class Members' health, conditions, treatment, etc.).

77. When communicating with VITAS, Plaintiff and Class Members had an objectively reasonable expectation of privacy. Plaintiff and Class Members did not expect that VITAS would intentionally use an electronic amplifying or recording device to record their confidential communications.

78. Plaintiff and Class Members did not consent to VITAS's intentional use of an electronic amplifying or recording device to record their confidential communications.

79. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by the violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of VITAS's violations of CIPA § 632(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statute referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: June 26, 2024                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ L. Timothy Fisher*
       L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Julia K. Venditti (State Bar No. 332688)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
       jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019

Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*